KRAMER, JUDGE:
*22 This case involves a dispute between Steven F. Lipson, the University of Louisville (the University), and the University Medical Center Inc. (UMC) regarding Lipson's pay for serving as Medical Director of the Outpatient Surgery Center (OSC), a UMC facility. Lipson appeals from three separate opinions and orders of the Franklin Circuit Court: (1) a March 2, 2015 opinion and order granting the University's motion for summary judgment on Lipson's claims and partial summary judgment on the University's counterclaims (Appeal No. 2015-CA-000487-MR); (2) an April 9, 2015 opinion and order granting UMC's motion for summary judgment (Appeal No. 2015-CA-000631-MR); and (3) an October 20, 2015 opinion and order granting the University's motion for entry of judgment (Appeal No. 2015-CA-001743-MR).
In Appeal No. 2015-CA-000487-MR, Lipson asserts the University should be liable for: (1) breach of contract; (2) failing to pay him appropriately based on the equitable remedy of unjust enrichment; (3) violating KRS 1 337.060, part of the Wage and Hour Act; and (4) depriving him of property without due process. He further argues that the circuit court erred when it summarily found him liable to the University for unjust enrichment and conversion.
In Appeal No. 2015-CA-000631-MR, Lipson argues that the circuit court erred when it dismissed his unjust enrichment claim against UMC.
In Appeal No. 2015-CA-001743-MR, Lipson argues that questions of fact precluded summary judgment regarding the net amount he owed the University. He further takes issue with the circuit court's award of prejudgment and post-judgment interest.
For the reasons explained below, we affirm the balance of the circuit court's judgments except for its determination regarding post-judgment interest in Appeal No. 2015-CA-001743-MR. As to that appeal, we reverse and remand with directions.
Lipson is an anesthesiologist. In 2010, he received a job offer from the University and University Anesthesia Associates, PSC (UAA). The terms of his employment were derived from a March 2010 letter of intent from the University, an April 2010 written agreement with UAA, and other documents (collectively, the written employment contract). In the letter of intent, Lipson was offered the position of Supervisor of UMC's Healthcare Outpatient Center (HCOC) also known as the OSC,[2] a full-time position which would not include *23 being on call or working weekends.[3] Lipson was also informed he would receive an annual work assignment outlining expectations for teaching, research, clinical service, and community or school service, and that he could expect a fiscal year salary increase of between 0-5% annually. The written agreement stated Lipson would be employed part time as an anesthesiologist for UAA and perform duties as assigned. Both the letter of intent and written agreement explained that Lipson would be employed by both the University and UAA and receive a salary from both entities totaling $277,000. However, the written documentation of how his salary was allocated differed.[4]
Lipson began his employment on July 1, 2010, and received his salary as specified by the written employment contract. In March 2011, Lipson met with Dr. Boswell, Chair of the Department of Anesthesiology and Perioperative Medicine, and others to discuss his proposed upcoming service as OSC Director and a proposed agreement between the University and UMC regarding his service in that position. Boswell then submitted a proposed Medical Director Agreement (Proposed 2011 Agreement) to Lipson, which detailed that UMC would pay the University an hourly amount for each documented hour of service by the OSC Director up to $50,000 per year and that up to an additional $50,000 would be provided contingent upon achieving specific metrics, for a total possible payment to the University of $100,000. The proposed agreement was silent on whether any of the payment the University received for Lipson's services would be passed through to Lipson.
Substantially the same Medical Director Agreement was executed in previous years between UMC and the University with the University's employee anesthesiologist, Dr. Gary Loyd, who served as OSC Director from September 2008 through December 2010.[5] Loyd, unlike Lipson, was specifically informed in his letter of intent when he was hired that he would be paid a $65,000 supplement from UAA for serving as OSC Director and an additional $100,000 supplement from UMC for being OSC Director.[6]
The OSC Director position, which consisted of about 40 hours of work per month, was rigorous; it entailed highly specific duties and increased responsibilities *24 not typical of medical director positions. Lipson told Boswell, his department chair, that he expected additional pay for these additional responsibilities, but the details of their exchange varied between the two of them. According to Boswell's affidavit and deposition, Lipson said he wanted the same arrangement as Loyd for serving as OSC Director. However, Boswell told Lipson the University would not pay him an additional salary, especially in light of his already reduced responsibilities compared to others in similar anesthesiology positions. Lipson denied these statements occurred.
Lipson, on the other hand, recounted in his affidavit that he told Boswell "looks like I'm getting a raise." Boswell responded, "you'll have to share it with me." Lipson responded, "that's fine." Lipson claims that Boswell later told him that he would keep the money for himself, to which Lipson replied that he would not perform as OSC Director unless he was paid to do so.
After Lipson received a letter from Boswell outlining his duties for the year including being OSC Director, his personal attorney revised the Proposed 2011 Agreement (Revised 2011 Agreement) so there was no question that he would be the person paid for performing work as the OSC Director; the agreement was also revised to allow Lipson to sign as a party rather than a University representative. Lipson submitted the Revised 2011 Agreement to Boswell, who told him he would "pass it on." Lipson followed up on the agreement's status on April 20, 2011, but he received no response.
According to Lipson, after he signed the Revised 2011 Agreement, he served as OSC Director from April 2011 through his resignation in September 2012, in addition to performing his other duties. However, he was never advised that the Revised 2011 Agreement was accepted. While he kept time records, he never submitted any timesheets because he was never instructed to do so. When Lipson began receiving larger paychecks in July 2011 (the start of the University's fiscal year), he believed his increased compensation was due to the acceptance of the Revised 2011 Agreement and was payment for his service as OSC Director.
In fact, the University and UMC never finalized a Medical Director Agreement for the 2011 calendar year. During the 2011 calendar year, no one submitted timesheets to UMC for the services of the OSC Director; and, UMC did not make any payments to the University.
In February 2012, a Medical Director Agreement (2012 Agreement) was ultimately signed by representatives of UMC and the University. It was substantially the same as all the prior Medical Director Agreements between UMC and the University. Lipson was among those signing for the University. Lipson stated in his affidavit that he signed the 2012 Agreement "because I was getting paid for the additional work load and responsibilities of Medical Director and believed that the new contract was merely to cover the new calendar year."
Beginning in February 2012, Lipson began submitting monthly time records accounting for the forty hours he expended each month as OSC Director. These time records covered January 2012 through July 2012.
In a May 24, 2012 letter to Lipson from Boswell on behalf of UAA discussing the proposed terms of Lipson's contract for the 2012-2013 fiscal year, Boswell stated that Lipson's current annual salary was a base of $243,271.24, supplemented by a $100,000 stipend for being OSC Director and also supplemented by $65,000 from UAA for taking a full call load, for total *25 compensation of $408,271.24. The letter indicated that Lipson's $65,000 supplement would be eliminated going forward if he did not take a full call load.
In a letter dated June 15, 2012, Lipson responded that he was not supposed to take a full call load, as his 2010 letter of intent indicated his position would not include call or weekends. He recognized that the terms of his employment could be altered prospectively and opted to continue in a non-call capacity despite the financial penalty.
On June 18, 2012, Boswell emailed Lipson stating:
Regarding my letter to you dated May 24, 2012, outlining the proposed terms of your contract for the 2012-2013 fiscal year, I must inform you that due to budgetary errors, the letter contains several inaccuracies. Therefore, I am withdrawing the offer of compensation made in the letter of May 24, 2012.
On June 21, 2012, Boswell and other University officials met with Lipson and informed him he had been overpaid $10,472.25 per paycheck beginning July 2011 and continuing through May 2012, for a total overpayment of $115,194.75 and that the University would recoup that amount from his prospective pay in accordance with its policy. Lipson disputed there was an overpayment. He claimed he was entitled to the additional salary for serving as OSC Director, and he demanded proof of the alleged error. However, there was no executed contract outlining his compensation for serving as the OSC Director during that time period.
That same date, Boswell drafted a letter to Lipson proposing that Lipson receive a base salary of $217,604.20, a supplement from UAA for OSC Director of $70,000, and a potential $65,000 supplement from UAA for a full call load.
For Lipson's June 2012 paycheck, the alleged overpayment amount was eliminated. In July 2012, the University demanded repayment and informed Lipson that the overpayment would be recouped from his future paychecks at a rate of $10,472.25 each month for a year. Lipson again disputed that there was an overpayment necessitating recoupment.
In August 2012, Lipson informed the University he was effectively resigning September 10, 2012. The University then seized $17,688.89 from Lipson's August 2012 payroll check and $4,088.64 from his September 2012 payroll check. Lipson then filed a complaint against the University and UMC ultimately alleging:[7] (1) breach of contract by the University in failing to pay Lipson's full salary; (2) unjust enrichment by the University for failing to pay him appropriately for the benefit he conferred on it; (3) violation of KRS 337.060 and KRS 337.385[8] by the University because, in his view, it had unlawfully recouped funds from his salary; (4) deprivation of his salary by the University without due process; and (5) unjust enrichment by UMC for failing to pay him working as OSC director. Lipson further requested compensatory and punitive damages, including *26 a refund of all sums seized and liquidated damages pursuant to KRS 337.385.
UMC answered arguing it had no direct agreement with Lipson, and Lipson could not recover against it on equitable grounds. UMC ultimately moved for summary judgment and asserted the same.
In the University's answer, it raised a number of defenses, including that the complaint in whole or in part was barred by sovereign immunity and/or governmental immunity. The University also counterclaimed, based upon what it alleged was Lipson's failure to repay the excess funds he had received, for unjust enrichment and conversion. The University also sought punitive damages.
Subsequently, the University moved for summary judgment as to Lipson's claims of breach of contract, unjust enrichment, violation of procedural due process, and violation of Kentucky's wage and hour statutes; and, it moved for partial summary judgment as to liability on its unjust enrichment and conversion claims. The University argued the undisputed facts established it never entered into a contract with Lipson agreeing to pay him additional amounts for the OSC Director position. Instead, any such additional amounts were the product of administrative error.
According to the affidavit of Linda J. Wilson, the University's Manager of Position Management, during fiscal year 2011 (July 1, 2010 through June 30, 2011), Lipson received compensation of $17,666.67 per month from the University. His monthly salary was received based on the position numbers assigned to him, including $1,721 a month under position number 90008064.[9] For that fiscal year, position number 90008064 was also used to pay Boswell.
Wilson's affidavit further established that in fiscal year 2012 (July 1, 2011 through June 30, 2012), the University changed its policy to require that position numbers be exclusive to each employee. As of July 2011, only Boswell was to be compensated under position number 90008064; however, Lipson erroneously continued to receive monthly compensation under that same position number, in the monthly amount of $10,472.25.[10] As a result, according to Wilson, Lipson was overcompensated by $10,472.25 for each of the months between July 2011 and May 2012, for an overpayment totaling $115,194.75.
Following a hearing and a lengthy period of discovery, on March 2, 2015, the circuit court granted the University's motion for summary judgment on Lipson's claims and partial summary judgment as to liability on the University's claims. The circuit court ruled that because Lipson was adequately compensated for his services under his written employment contract, the University did not breach its contract with Lipson. Lipson had no due process claim because he had no legitimate property interest in the overpaid amounts and, regardless, he had received notice and an opportunity to be heard. There was no wage and hour violation because Kentucky law authorized the University to withhold *27 wages that are owed. The circuit court did not directly address Lipson's unjust enrichment claim against the University. The circuit court found Lipson was unjustly enriched and converted the University's money when he retained money that was paid to him in error.
On April 9, 2015, the circuit court granted UMC's motion for summary judgment on Lipson's claims against it. The circuit court determined that because it had already ruled Lipson was adequately compensated for his work under the terms of his employment contract with the University, he could not recover from UMC under unjust enrichment.
On October 20, 2015, the circuit court awarded the University judgment on "a principal balance of $93,417.22, effective March 2, 2012." The circuit court also awarded the University pre-judgment and post-judgment interest.
As previously mentioned, Lipson appealed from each of these judgments. This Court designated the three appeals to be heard together.
"The standard of review on appeal of a summary judgment is whether the [circuit] court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." Scifres v. Kraft , 916 S.W.2d 779, 781 (Ky. App. 1996). Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.' " Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 483 (Ky. 1991) (quoting Paintsville Hospital Co. v. Rose , 683 S.W.2d 255, 256 (Ky. 1985) ).
We will first address all of Lipson's claims that were dismissed against the University and UMC. Next, we will address the University's claims against Lipson and the damages flowing therefrom.
In considering each of Lipson's claims against the University, we must first address the issue of governmental immunity.[11] The Kentucky Constitution § 231 provides that "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." Consequently, the Commonwealth and its agencies, including the University of Louisville, cannot be sued except upon a specific and explicit waiver of governmental immunity by the General Assembly. Commonwealth v. Whitworth , 74 S.W.3d 695, 699 (Ky. 2002) ; Univ. of Louisville v. Martin , 574 S.W.2d 676, 677 (Ky. App. 1978). Kentucky courts will grant a statutory waiver of governmental immunity "only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." Withers v. Univ. of Kentucky , 939 S.W.2d 340, 346 (Ky. 1997) (internal citation and quotation omitted).
A. Lipson's Breach of Contract Claim (Lipson v. the University, relating to Appeal No. 2015-CA-000487-MR)
Lipson argues the University breached his written employment contract by seizing portions of his August and September 2012 paychecks. Lipson also argues *28 the University breached the 2012 Agreement when it withheld any of the compensation he believed he was owed under that agreement, i.e. , the approximately $33,000 UMC paid the University for his services for that year.
In regard to Lipson's claims for breach of contract for his written employment contract and the 2012 Agreement, the Model Procurement Code, KRS 45A.245(1), waives government agencies governmental immunity for a lawfully authorized written contract. Univ. of Louisville v. Rothstein , 532 S.W.3d 644, 650 (Ky. 2017). Regardless, Lipson cannot establish that his written employment contract was violated because he received more total wages than what were due him under the terms of this contract.
Lipson cannot recover under the 2012 Agreement because the agreement was between the University and UMC, with Lipson only signing as a University representative. The 2012 Agreement did not contain any provision providing that Lipson would be paid any portion of the amount UMC agreed to pay the University to Lipson for the OSC Director position.[12] Therefore, Lipson could not claim an entitlement to be paid under the terms of the 2012 Agreement, and his claims against the University for breach of contract fail.
B. Lipson's Unjust Enrichment Claim (Lipson v. the University, relating to Appeal No. 2015-CA-000487-MR)
Whatever the merits of Lipson's unjust enrichment claim against the University may be, Lipson cannot recover against the University under this equitable remedy because there is no waiver of immunity for anything other than a written contract. See Whitworth , 74 S.W.3d at 700 (holding governmental immunity prevents the enforcement of an oral contract); Furtula , 438 S.W.3d at 310 (holding no waiver of governmental immunity for oral or implied contracts). Therefore, the University was properly granted summary judgment in its favor as to Lipson's claim for unjust enrichment.
C. Lipson's Wage and Hour Claim (Lipson v. the University, relating to Appeal No. 2015-CA-000487-MR)
Lipson argues that the University violated KRS 337.060, part of the Wage and Hour Act, when it withheld portions of the monthly wages he was entitled to receive. KRS 337.060(1) provides in pertinent part as follows:
No employer shall withhold from any employee any part of the wage agreed upon. This section shall not make it unlawful for an employer to withhold or divert any portion of an employee's wage when the employer is authorized to do so by local, state, or federal law or when a deduction is expressly authorized in writing by the employee[.]
The initial question we must address is whether governmental immunity has been waived under the Act.
In Tiller v. Univ. of Kentucky , 55 S.W.3d 846, 850 (Ky. App. 2001), the Court opined in dicta that "KRS Chapter 337 contains no waiver of [governmental] immunity for wage discrimination claims *29 against the Commonwealth." However, the Kentucky Supreme Court suggested that immunity is waived in Madison Cty. Fiscal Court v. Kentucky Labor Cabinet , 352 S.W.3d 572 (Ky. 2011).
In Madison County the Court was asked to decide whether cities and counties which participated in the Professional Firefighters Foundation Program Fund were entitled to immunity against claims that they violated the Wage and Hour Act. Noting that Withers requires that immunity be expressly waived by the General Assembly, the Court held that the General Assembly had done so by the enactment of the Wage and Hour Act. The Court explained:
The foregoing statutes overwhelmingly imply, as required by Withers, that the legislature did not intend to cloak city or county governments with governmental or sovereign immunity from the very liability that the statutes expressly placed upon them. A statute directing a governmental unit to pay its employees in a prescribed manner necessarily and overwhelmingly implies a waiver of immunity from liability to the employees for non-payment. Otherwise, the statute requiring such overtime pay is a nullity.
Madison Cty. , 352 S.W.3d at 576. The Court further noted that its reasoning would be the same even if the cities and counties acted as agents of the state because the General Assembly waived any governmental or sovereign immunity that the state might have. Id.
Similarly, in Ivey v. McCreary Cty. Fiscal Court , 939 F.Supp.2d 762, 766 (E.D. Ky. 2013), a federal district court reached the same conclusion. The Court discussed Madison County in response to McCreary County's immunity defense to a wage and hour claim. The Court concluded that any caselaw granting such immunity that predated Madison County was no longer good law, explaining that Madison County "holds that KRS Chapter 337 overwhelmingly implies that sovereign immunity has been waived for Kentucky wage and hour claims." Ivey , 939 F.Supp.2d at 766. Based on the foregoing, it is evident that governmental immunity does not act as a shield for the University on this issue.
Having determined that the University's governmental immunity has been waived, we next examine whether Lipson's claim under KRS 337.060(1) was properly denied on summary judgment. Under KRS 337.060(1), the University could not withhold from Lipson any part of the wage agreed upon, unless such withholding was authorized by law. KRS 337.020 provides that employers shall pay "employees all wages or salary earned" and "[e]very such employee shall have a right of action against any such employer for the full amount of his wages due on each regular pay day." See KRS 337.055 (providing for payment in full after an employee leaves his employment). Therefore, Lipson had a right to be paid all wages due to him.
The University argues it is indisputable that Lipson was overpaid based on its internal records. Therefore, its action in withholding money from Lipson's final paychecks did not violate KRS 337.060(1) because it was authorized to withhold money from Lipson's paychecks under KRS 44.030(1). We agree.
At the time the University withheld Lipson's wages, KRS 44.030(1) provided as follows:
No money shall be paid to any person on a claim against the state in his own right, or as an assignee of another, when the person or the person's assignor is indebted to the state or any county, city, urban-county government, consolidated local government, or charter county government duly organized in this state.
*30 The claim, to the extent it is allowed, shall first be credited to the account of the person so indebted to the state, and if there is any balance due the person after settling the whole demand of the state, any certified liquidated debts of any county, city, urban-county government, consolidated local government, or charter county government of this state shall be paid. If there is any balance due the person after settling the whole demand of the state, counties, cities, urban-county governments, consolidated local governments, or charter county governments, and if there are not liquidated debts certified against the claim pursuant to [Section 2 of this Part,] that balance shall be paid to the person.
The University and the circuit court placed heavy reliance on this statute as an earlier version of it was interpreted by Whitworth v. Miller , 302 Ky. 24, 193 S.W.2d 470 (1946). In Whitworth , a Commonwealth's Attorney hired another attorney to perform his job while he was serving in the armed forces during World War II but continued to receive his pay; after he returned to his position and resumed his duties, his salary was withheld on the basis that he should not have been paid while he was not performing the duties of his position. The Court held that wages could be withheld from the Commonwealth's Attorney because " KRS 44.030 forbids the payment of money by the Commonwealth to any one indebted to it until that debt is satisfied." Whitworth , 193 S.W.2d at 473.
Lipson argues that KRS 44.030 and Whitworth do not apply because he disputes the existence of the debt, which, in his view, renders the debt unliquidated. In his brief he states, "for a debt to be liquidated there must be a final determination establishing both the existence and amount of that debt." However, Lipson cites no legal authority for that particular definition. The Kentucky Supreme Court has stated, "[p]recisely when the amount involved qualifies as 'liquidated' is not always clear, but in general 'liquidated' means '[m]ade certain or fixed by agreement of parties or by operation of law.' " Nucor Corp. v. General Elec. Co. , 812 S.W.2d 136, 141 (Ky. 1991) (quoting BLACK'S LAW DICTIONARY (6th ed. 1990) ). The Kentucky Supreme Court gave further guidance to determine when a debt is "made certain" when it stated, "[l]iquidated claims are 'of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values.' " 3D Enterprises Contracting Corp. v. Louisville and Jefferson Cty. Metro. Sewer Dist. , 174 S.W.3d 440, 450 (Ky. 2005) (quoting 22 AM. JUR. 2D Damages § 469 (2004) ).
According to this language, for a debt to be liquidated there need not be a final determination establishing the existence or amount of the debt. Instead, the Supreme Court simply requires the debt be "made certain[.]" A debt is made certain when it can be ascertained by "known standards of value[.]" As previously mentioned, Lipson cannot establish evidence to contradict the University's evidence that he received more total wages than what were due to him under the written contract. Further, he provides nothing to contradict the University's evidence that for eleven months he was paid an extra $10,472.25 a month. That dollar figure and the eleven-month time period are both "known standards of value[.]" Therefore, Lipson's debt was "made certain" when the University discovered the administrative error and began withholding portions *31 of Lipson's wages; thus, the debt was liquidated.
In sum, Lipson was indebted to the University, a state agency, for a liquidated sum. As in Whitworth , KRS 44.030 permitted the University to withhold wages that were owed to Lipson. Therefore, his claim pursuant to KRS 337.060 under the Wage and Hour Act fails.
D. Lipson's Due Process Claim (Lipson v. the University, relating to Appeal No. 2015-CA-000487-MR)
Lipson next argues the circuit court erred in failing to allow him to prosecute a due process claim against the University. He asserts that he had a property interest in the overpaid wages, and the University violated his procedural due process when it began recouping them. We disagree.
First, we recognize "[t]he fundamental right of due process cannot be trumped by [governmental] immunity." See Miller v. Admin. Office of the Courts , 361 S.W.3d 867, 876 (Ky. 2011). With that said, turning to procedural due process's relation to property interests, "[b]oth the United States and Kentucky Constitutions protect a person against deprivation of his or her property interests without due process of law." Romero v. Admin. Office of the Courts , 157 S.W.3d 638, 640 (Ky. 2005). As explained by the United States Supreme Court, due process is required where a person has a requisite property interest that is "more than an abstract need or desire[,] ... more than a unilateral expectation ... [but one where] instead, [the person] ha[s] a legitimate claim of entitlement[.]" Bd. of Regents of State Colleges v. Roth , 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). However, "a mere subjective expectancy" of entitlement is not protected by procedural due process. Perry v. Sindermann , 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972) (internal quotation marks omitted).
Without an executed contract detailing the increase in pay, Lipson's expectation of this entitlement was merely subjective. Lipson received the due process to which he was entitled through the adjudication of his civil proceeding in Franklin Circuit Court, as well as the instant appeal arising therefrom. Accordingly, his procedural due process claim fails as a matter of law.
E. Lipson's Unjust Enrichment Claim Against UMC (Lipson v. UMC, relating to Appeal No. 2015-CA-000631-MR)
Lipson argues that for the work he performed as OSC Director during 2011, he can recover under unjust enrichment against UMC if it is shown that UMC benefited from his efforts, did not pay him for the work performed, and was enriched thereby.
UMC, on the other hand, argues Lipson cannot prevail on this claim because Lipson was fully compensated by the University. Alternatively, assuming arguendo Lipson did confer a benefit to UMC at his expense, the retention of that benefit by UMC was not inequitable. UMC only arguably owed the University, and not Lipson, for Lipson's work.
We agree with UMC because UMC never agreed to pay Lipson directly under the terms of any Medical Director Agreement. While Lipson was named in the Proposed 2011 Agreement and in the 2012 Agreement, he was only named as an agent to be supplied by the University. Therefore, UMC had no expectation that Lipson would expect it to pay him where it rejected his Revised 2011 Agreement and knew the service he was providing was as a University employee. Only the University *32 could have a claim for inequitable retention of a benefit without payment for its value against UMC for 2011. Therefore, summary judgment was properly granted in UMC's favor.
F. The University's Unjust Enrichment and Conversion Claims (the University v. Lipson, relating to Appeal No. 2015-CA-000487-MR)
We next consider whether the University was entitled to summary judgment on its claims of unjust enrichment and conversion. Lipson argues that he and the University have competing claims regarding the fact and amount of the alleged overpayment. Lipson argues he was not unjustly enriched and did not convert the University's property because he did not intend to keep anything that was not his; instead, he disputed the fact and amount of the purported overpayment and initiated his lawsuit to resolve the dispute. He argues demanding proof of a claim of overpayment is not conversion.
The University argues that the circuit court properly granted it summary judgment on its claims because Lipson was only entitled to his regular salary. In the University's view, after it informed Lipson of the overpayment, Lipson was unjustly enriched and converted the University's money when he chose to retain the overpayment and resigned before the sum could be fully recouped from his paychecks. We agree.
In order to succeed on an unjust enrichment claim, the University must show: (1) that a benefit was conferred on Lipson at the University's expense; (2) that there was a resulting appreciation of the benefit by Lipson; and (3) that Lipson had inequitably retained the benefit without payment for its value. Jones v. Sparks , 297 S.W.3d 73, 78 (Ky. App. 2009).
These elements were easily satisfied when Lipson retained the overpayment and refused to pay it back to the University. In turn, when these elements are satisfied, "[t]he equitable doctrine of unjust enrichment is applicable as a basis of restitution to prevent one person for keeping money or benefits belonging to another." Rose v. Ackerson , 374 S.W.3d 339, 343 (Ky. App. 2012) (internal quotations and citation omitted); see also Phoenix Indem. Co. v. Steiden Stores, Inc. , 267 S.W.2d 733, 734 (Ky. 1954) ("[W]henever, by a clear or palpable mistake of law or fact essentially bearing upon and affecting the contract, money has been paid without consideration, which in law, honor, or conscience was not due and payable, and which in honor or good conscience ought not to be retained, it may and ought to be recovered." (quoting Supreme Council Catholic Knights of America v. Fenwick , 169 Ky. 269, 183 S.W. 906, 910 (1916) ) ). Lipson did not simply demand proof of the error, as he contends. When notified of the error and the University's subsequent plan to recoup the overpayment, Lipson resigned and refused to remit the remaining amount. Therefore, the circuit court did not err in finding that Lipson was unjustly enriched by the University.
Turning to the University's claim of conversion, it must establish: (1) that it held legal title to the converted property; (2) that it had the right to possess the property at the time of conversion; (3) that Lipson exercised dominion and control over the property in a manner that deprived the University of the right to use and enjoy the property; (4) that the University demanded the return of the property and Lipson refused; (5) Lipson's action was the legal cause of the University's loss of property; and (6) the University suffered damages by the loss of property.
*33 Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon , 157 S.W.3d 626, 632 n.12 (Ky. 2005) (quoting 90 C.J.S. Trover and Conversion § 4 (2004) ).
The conversion elements were also satisfied when Lipson refused to pay the money back to the University. First, because the excess payments were not agreed upon, the University retained legal title to them. Second, the University had the right to possess the payments because the payments were not agreed upon by the parties. Third, Lipson exercised dominion and control over the property, depriving the University of control, when he refused to return the excess funds. Fourth, the University demanded the return of the funds, and Lipson refused to accede to that demand. Fifth, after discovering the administrative error, Lipson's refusal to return the excess funds was the direct cause of the loss of those funds. And sixth, the University suffered damages from Lipson's refusal to return the funds. Therefore, the circuit court did not err in finding that Lipson was liable for conversion.
G. Damages and Interest (the University v. Lipson, relating to Appeal No. 2015-CA-001743-MR)
Lipson argues the circuit court erred in its award of damages to the University. Specifically, he argues that: (1) the circuit court erred in its calculations of damages by not using the University's policy and procedure to determine the amount due to the University; (2) the award of prejudgment interest was improper because the dollar amount was unliquidated; (3) the equities should have precluded any award of prejudgment interest on the damages; and (4) the award of post-judgment interest was improper because the circuit court chose the incorrect date to start the accrual of said interest. That said, we agree with the balance of the circuit court's decisions regarding damages, except for its determination to award post-judgment interest. We will address each of Lipson's arguments in turn.
As to Lipson's first argument, the circuit court ultimately adopted the calculation the University outlined in its memorandum on damages. The University argued for repayment of the gross total Lipson was overpaid. As previously mentioned Lipson was overpaid $10,472.25 for eleven months (July 2011-May 2012), for a total of $115,194.75. Subtract $21,777.53, which is the amount the University withheld from Lipson's last paychecks, and the total is $93,417.22. This amount represents the gross amount Lipson owes the University.
Lipson contends the circuit court should have used the University's policy and procedure to calculate the damages. In his memorandum on damages, Lipson attached the University's policy on "Collection of Payroll Overpayments." In pertinent part this policy stated:
The amount of the overpayment to be collected by the Payroll Department will vary depending upon whether the current and/or prior calendar year records must be adjusted.
....
If a prior calendar year is involved, and the University has not filed final tax returns for the previous year, the employee would be responsible for returning only the net amount of the overpayment plus all overpaid federal and state taxes credited in error to the employee.
Using this calculation, Lipson argues that the net amount he owes the university is $77,032.47.[13]
*34 However, Lipson fails to consider one important fact: At the time he initiated these proceedings, he was no longer an employee of the University. He was an employee when the University recouped the funds from two of his paychecks, but not when his resignation became effective. After his resignation became effective, he converted and was unjustly enriched by the remaining overpayments, which totaled $93,417.22. Furthermore, one of the causes of action the circuit court decided that Lipson was liable for was conversion, a tort. In tort actions, compensatory damages are awarded for the purpose of making the injured party whole. Kentucky Cent. Ins. Co. v. Schneider , 15 S.W.3d 373, 374 (Ky. 2000) (citing 22 AM. JUR. 2d Damages § 26 (1988) ). Here, the University is the injured party. When Lipson ceased his employment with the University and refused to return the overpayment, the University was able to recoup $21,777.53 of the $115,194.75 Lipson was overpaid. Lipson provides no evidence to refute the amount of the overpayment or the amount the University was able to recoup. To make the University whole, Lipson would have to pay the University $93,417.22; therefore, the circuit court did not err in ordering Lipson to pay that amount as damages for converting the University's property.
As to Lipson's second and third arguments, these take issue with the circuit court's award of pre judgment interest. In his view, the amount owed was unliquidated; therefore, the award of prejudgment interest was improper because the equities were in his favor. However, and as previously mentioned, the amount was liquidated because it "[could] be ascertained in accordance with ... known standards of value[.]" 3D Enterprises Contracting Corp. , 174 S.W.3d at 450. Statutory interest is recoverable as a matter of right on liquidated debts. See Alexander Hamilton Life Ins. Co. v. Lewis , 550 S.W.2d 558, 560 (Ky. 1977) (citing Shanklin v. Townsend , 434 S.W.2d 655, 656 (Ky. 1968) ("It is well established that interest is recoverable as a matter of law in an action upon a liquidated claim.") ). Therefore, the circuit court did not err in awarding prejudgment interest.
As to his final argument, he takes issue with the circuit court's award of post judgment interest. We review this point under an abuse of discretion standard. See Hazel Enterprises, LLC v. Ray , 510 S.W.3d 840, 845 (Ky. App. 2017). In the October 2015 order awarding damages, the circuit court awarded the University statutory postjudgment interest and set the accrual date as March 2, 2015, the date of the order finding Lipson liable to the University for conversion and unjust enrichment. In Lipson's view, the circuit court erred because the accrual date should have been the date of the final judgment awarding damages.
At the time of the circuit court's order, KRS 360.040 stated, in pertinent part:[14] "[A] judgment shall bear twelve (12%) interest compounded annually from its date." Obviously, this issue turns on three words in KRS 360.040 : "[F]rom its date." The Kentucky Supreme Court has recently offered guidance holding that the above-quoted *35 language alludes to a final judgment. Specifically, it stated:
KRS Chapter 360 (the "Interest and Usury" chapter) does not define "judgment" for purposes of the post-judgment interest statute, but as generally understood in our law, "[a] judgment is a written order of a court adjudicating a claim or claims in an action or proceeding." CR 54.01. The statute has historically been read as referring to the "judgment" of the [circuit] court. The statute's reference to the judgment's "date," in the singular, furthermore, indicates the [circuit] court's "final judgment," which our rules define as "a final order adjudicating all the rights of all the parties in an action or proceeding."
Commonwealth, Justice and Pub. Safety Cabinet, Dep't of Kentucky State Police v. Gaither , 539 S.W.3d 667, 672 (Ky. 2018). The March 2, 2015 order did not adjudicate all the rights of all the parties in the action. Namely, it did not adjudicate the amount of money the University had a right to recoup. That was adjudicated in the October 2015 order. We hold that postjudgment interest should begin to accrue from the date of the order awarding postjudgment interest. Therefore, the circuit court abused its discretion when it ordered the accrual of postjudgment interest to begin March 2, 2015. The correct date for postjudgment interest to accrue should have been October 15, 2015.
In light of the foregoing, we AFFIRM the circuit court's determination regarding all issues, except for its determination regarding post-judgment interest in Appeal No. 2015-CA-001743-MR. That determination is REVERSED and REMANDED to the circuit court with directions to enter a new judgment in accordance with our decision to begin the accrual of postjudgment interest on October 15, 2015.
NICKELL, JUDGE, CONCURS.
THOMPSON, JUDGE, CONCURS IN PART, DISSENTS IN PART AND FILES SEPARATE OPINION.
I concur in part of the majority's opinion. However, I must disagree that governmental immunity precludes Lipson from pursuing his counterclaim against the University of Louisville to offset its damages and the University was entitled to summary judgment on its unjust enrichment and conversion claims. I also disagree that there is no genuine issue of material fact regarding Lipson's wage and hour claim and due process claim and that the award of prejudgment interest to the University was proper.
Long ago, Kentucky law established that a citizen has a "right to assert his claim for damages in actions against him by the commonwealth[.]" Commonwealth v. Todd , 72 Ky. (1 Bush) 708, 716 (1873). That right "rests upon that broad principle of justice which allows every one who is sued to show, as matter of law, that he does not owe the demand for which he is sued." Id. Later, in Commonwealth v. Owensboro & N.R. Co. , 81 Ky. 572, 573-74 (1884), the Court explained that "[w]hen the State undertakes to litigate with the citizen, the latter may, by way of set-off or counter claim, make such defense as will defeat the recovery[.]"
The same reasoning was applied in Commonwealth v. Barker , 126 Ky. 200, 103 S.W. 303, 305 (1907), based on analogous facts to the present. In Barker , the Commonwealth claimed the payments the defendant received for collecting licensing fees were not permitted by law and had to be returned, and the defendant could not defend his entitlement to retain the money on an equitable basis because of sovereign *36 immunity. The Court reasoned this outcome was unjust, explaining:
The commonwealth cannot be permitted to allow one to go on ... giving his whole time and services for its advantage, and, after paying him for such services, then ... recover it from him as money paid under a mistake of law, and leave him without any sort of recourse.
Id. The Court then concluded "[w]hen the state sued appellee, he became at once entitled to maintain any counterclaim he had against it, although he could not have set up the counterclaim as an original cause of action, for the reason that a citizen cannot sue the state without its consent." Id. The holding in Barker was reaffirmed in All-Am. Movers, Inc. v. Kentucky ex rel. Hancock , 552 S.W.2d 679, 681 (Ky. App. 1977).
By counterclaiming for unjust enrichment and conversion the University became a plaintiff. By bringing those claims, the University waived its governmental immunity so that Lipson can assert defenses for set-off even though those same claims would be barred by governmental immunity if made as damages claims.
There is a material issue of fact as to whether Lipson inequitably retained a benefit without payment for its value. The University could not establish conversion because it could not establish as a matter of law interference with possession, loss and damage where there was a bona fide dispute as to who owned the funds the University was attempting to collect. There is a disputed issue of fact as to whether Lipson was adequately compensated for 2011 and 2012 performance as OSC Director, especially during 2012 where the University was paid for his service pursuant to the 2012 Agreement with UMC. Notably, because immunity does not apply to Lipson's defenses, Lipson could defend his right to retain this money based on having an oral contract with the University or one implied by law based on equitable principles. Therefore, the majority erred by affirming the grant of summary judgment to the University on its claims against Lipson because they were unliquidated where Lipson had a valid counterclaim.
I also dissent from the majority's conclusion that Lipson was precluded from recovering for a violation of the Wage and Hour Act. Under KRS 337.060(1) and KRS 337.020, Lipson had a right to be paid all wages agreed upon as due every regular pay day. By withholding money from Lipson's last two paychecks the University failed to pay Lipson his ongoing contractually agreed-upon wages. The Wage and Hour Act does not provide an exception for employers withhold an employee's full wages to recoup past overpayments.
Whitworth v. Miller , 302 Ky. 24, 193 S.W.2d 470 (1946), is not controlling on the issue of whether withholding money from Lipson's paychecks was authorized by KRS 44.030(1). Whitworth is distinguishable because there was no dispute that the Commonwealth's Attorney did not perform his job. Instead, he hired another attorney to perform his constitutional duties. The amount the Commonwealth's Attorney owed for not performing his job was a liquidated sum. Here, it is undisputed that Lipson fully performed all the duties of the OSC Director and Lipson vigorously contests the University's claim of overpayment.
Additionally, Whitworth 's precedential value beyond its specific facts is questionable because it predated the Wage and Hour Act. As noted in Reliance Ins. Co. v. Commonwealth, Dep't of Transp. , 576 S.W.2d 231, 234 (Ky. App. 1978), " KRS 44.030 is but an extension to the government of the equitable right of set-off given to all persons." That equitable right of set-off *37 does not permit a governmental entity to violate the Wage and Hour Act by unilaterally withholding disputed wages. Because the University had no right of set-off when it withheld Lipson's wages, I would permit Lipson to proceed on his wage and hour claims.
The distinction between a liquidated and unliquidated claim is significant and has not only implications for any analysis under the Wage and Hour Act but also under the Constitution. "The Fourteenth Amendment's protection of 'property[ ]' ... has never been interpreted to safeguard only the rights of undisputed ownership. Rather, it has been read broadly to extend protection to 'any significant property interest[.]' " Fuentes v. Shevin , 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972) (internal citation omitted). It does not matter that the person's ultimate right to continued possession of the property is in dispute. Id. at 87, 92 S.Ct. at 1997-98. Employees have a protected property interest in receiving their salary even if there is some dispute as to their entitlement to it. Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist. , 149 F.3d 971, 982-83 (9th Cir. 1998) ; Leirer v. Caputo , 81 N.Y.2d 455, 459-60, 599 N.Y.S.2d 792, 616 N.E.2d 147, 148-49 (1993) ; State v. Adams , 107 Wash.2d 611, 616, 732 P.2d 149, 154 (1987) ; Eguia v. Tompkins , 756 F.2d 1130, 1138-41 (5th Cir. 1985).
In Adams , 107 Wash.2d at 613-14, 732 P.2d at 152-53, although the employees acknowledged there was a shift differential error resulting in overpayments, the Court ruled the employees had a property interest in the salary received where they challenged the total amount of overpayments was in dispute. While the state had the right and duty to recover the overpayments, it could not act unilaterally in deducting such overpayments from the employees' paychecks without violating their constitutional right to due process. Id. at 619, 732 P.2d at 155. The Court held: "Where ... there are no statutory procedures to protect public employees from an erroneous claim, the State's only means of recovery is by filing a civil action seeking a money judgment for the amount of the overpayments." Id.
Similarly, in Leirer , a county clerk had a property interest in her salary even though the county comptroller determined after an audit that the clerk was not working all the hours she claimed. The comptroller violated the clerk's due process rights by making the unilateral decision to withhold 10% from her wages to recoup the alleged overpayment. Leirer , 81 N.Y.2d at 460-62, 599 N.Y.S.2d 792, 616 N.E.2d at 149-50. The Court specifically rejected the argument that the common law right to a set-off could justify the government's use of self-help to collect a disputed debt from a governmental employee, explaining:
[C]ommon-law recoupment is essentially a defensive mechanism available to a payer, interjected to offset continuing expenditures to or damage claims against a payee. It has not been traditionally allowed as a self-help recovery plan.... [It is not a] substitution for an independent adjudicative modality of establishing a debt (e.g., by concession, agreement, litigation, or the like) before recoupment can be interposed.
Id. at 460, 599 N.Y.S.2d 792, 616 N.E.2d at 149. The Court held "that ... common-law recoupment powers ... do not extend to the unilateral design and execution of a wage withholding regime to recoup purported salary overpayments ... when the basis for and amounts of the overpayments were never reduced to an established debt[.]" Id. at 462, 599 N.Y.S.2d 792, 616 N.E.2d at 150.
*38 Similarly, in Atwater v. Roudebush , 452 F.Supp. 622, 628-31 (N.D. Ill. 1976), the Court held that even where the existence and amount of a governmental employee's debt is undisputed, an informal pre-deprivation conference could not satisfy due process where it only explained the consequences to the employee of a decision that had already been made, the employee was not given an opportunity to review the agency's evidence, respond in writing and submit additional evidence, or seek review.
The meeting that the University held with Lipson was similar to those deemed inadequate in Leirer and Atwater as it was only held to inform Lipson of the University's decision. Whatever minimal process Lipson received from that meeting, it was insufficient to protect his due process rights, given his significant property interest. Because there were no statutory or regulatory procedures in place setting out how the pre-deprivation process should be conducted, the University should have filed a civil action as explained in Adams rather than use self-help to collect a disputed debt. Whether or not the University was ultimately correct that Lipson owed it money is irrelevant in evaluating what pre-deprivation process is constitutionally adequate.
Finally, I disagree with the majority's conclusion that the University was entitled to prejudgment interest. Even if the majority is correct that summary judgment was properly granted to the University, it is not appropriate to allow the University to collect on a sum that it claims was liquidated when Lipson resigned, and the University failed to provide any proof to Lipson as to how he was overpaid despite his demands for such information. If the University could explain how Lipson was overpaid, it should have done so when its representatives met with Lipson to tell him he had been overpaid and about its recoupment plan, rather than withholding the information justifying its actions until it filed its motion for summary judgment. It is inappropriate to award prejudgment interest under these circumstances.
Accordingly, I concur in part and dissent in part.

Based on the depositions, affidavits and accompanying exhibits, it appears that HCOC and the OSC are the same facility and the terms are used interchangeably. Henceforth, we will refer to the OSC when either term is used, except when discussing the letter of intent regarding Lipson's employment.

Of note, not taking a full call load or working weekends is out of the ordinary at OSC, as the record supports that most anesthesiologists at the facility maintain those duties.

The letter of intent specified Lipson's annual pay would consist of an institutional base salary of $241,700, x-pay (productivity bonus) of $14,648 and x-pay (supplement) of $20,652, for a total salary of $277,000. The written agreement provided Lipson would receive an annual salary of $277,000 to be paid by both the University ($212,000) and UAA ($65,000).

While it is disputed whether Supervisor of the HCOC was supposed to be the same position as OSC Director and whether Loyd continued in this position after Lipson began working, it is undisputed that Loyd submitted timesheets as OSC Director through the end of 2010. Moreover, the Medical Director Agreement and Amendment covering this time provided Loyd would be the one serving as OSC Director until the end of 2010. For purposes of evaluating whether summary judgment was properly granted, we interpret these disputed factual questions in Lipson's favor.

Loyd's letter of intent specified that the OSC Director supplement would be in the form of a $50,000 base salary for administrative duties and an additional $50,000 at the end of each fiscal year that was linked to achieving specific metrics. It also specified he would receive 60% of each kind of supplement while serving as department chair until a new permanent department chair took over, at which time he would receive this full supplement.

Over the course of this litigation, Lipson was eventually granted the opportunity to file an amended complaint. In his amended complaint, he dropped several causes of action against UMC while adding causes of action against the University. For sake of simplicity, we will list only the causes of action that survived these amendments.

Lipson's complaint references KRS 337.365 rather than KRS 337.385. This is clearly a typographic error as KRS 337.365 addresses rest periods for employees. The University also recognized this was an error and addressed its arguments to a claimed violation of KRS 337.385.

Lipson received $14,725 monthly base pay through position number 90003431, $1,721 monthly supplemental pay through position number 90008064, and $1,220.67 monthly x-pay through position number 90013880.

Lipson received monthly base pay of $15,110.83 under his same original monthly base pay position number 90003431, received monthly supplemental pay of $1,768.50 under new position number 90007637, received monthly x-pay of $1,254.33 under his same original x-pay position number 90001330, and also received monthly pay of $10,472.25 under his original supplemental pay position number 90008064.

As an aside, the parties refer to this protection as sovereign immunity. To be clear, state agencies, like the University, are shielded by governmental immunity, not sovereign immunity. While governmental immunity is related to and flows from sovereign immunity, it is nevertheless a slightly different concept. Furtula v. Univ. of Kentucky , 438 S.W.3d 303, 305 n.1 (Ky. 2014).

In this respect the 2012 Agreement was identical to the Proposed 2011 Agreement that Lipson refused to sign for that same reason. If Lipson was satisfied that the Proposed 2011 Agreement required that the amount UMC paid for the University for his services would be passed through to him, there would have been no need for him to hire his attorney to draft the Revised 2011 Agreement to clarify this matter. If this was the University and UMC's understanding of the agreement, there would have been no need for the University and UMC to reject his proposed revision.

Lipson's memorandum breaks down the calculation in detail. Using that calculation and taking into account excess federal and state income taxes, the eleven-month overpayment total comes to $98,810. Subtract the $21,777.53 seized from Lipson's paycheck for his purported total of $77,032.47.

This statute was amended in 2017. However, the amendments apply to judgments entered by a court on or after June 29, 2017. See 2017 Ky. Acts ch. 17, sec. 4. Accordingly, we will apply the previous version of the statute to the facts of this case.